[Cite as *In re Estate of Boggs v. Todd*, 2025-Ohio-1947.]

IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
MIAMI COUNTY

| | |
|---|---|
| IN THE MATTER OF: ESTATE OF DOROTHY K. BOGGS | : |
| | : |
| | :    C.A. No. 2024-CA-23 |
| RUBY ANN SOWRY, EXECUTOR | : |
| | :    Trial Court Case No. 90684-A |
|      Appellant | : |
| | :    (Appeal from Common Pleas Court- |
| v. | :    Probate Division) |
| | : |
| MARY LISA TODD | : |
| | : |
|      Appellee | |

. . . . . . . . . .

O P I N I O N

Rendered on May 30, 2025

. . . . . . . . . .

WILLIAM M. HARRELSON, II & ROBERT M. HARRELSON, Attorneys for Appellant

TERRY W. POSEY, JR., GREGORY M. GANTT, & ERIK R. BLAINE, Attorneys for Appellee

. . . . . . . . . . . .

LEWIS, J.

{¶ 1} Plaintiff-Appellant Ruby Ann Sowry, as executor of the estate of Dorothy K. Boggs, appeals from an order of the Miami County Court of Common Pleas, Probate Division, which granted summary judgment to Defendant-Appellee Mary Lisa Todd on Sowry's complaint. For the following reasons, we will affirm the judgment of the trial court.

I.      Course of Proceedings

{¶ 2} On August 19, 2020, Sowry, as executor of the estate of her mother, Dorothy K. Boggs, filed a complaint in the probate court against her sister, Todd.   According to the complaint, while Boggs was alive, Todd removed, concealed, converted, embezzled, or otherwise improperly took control of nearly $100,000 that was contributed solely by Boggs to multiple joint bank accounts.   The complaint sought declarations that the money Todd transferred out of these joint accounts was an asset of Boggs's estate.

{¶ 3} Todd filed an answer to the complaint and a motion for judgment on the pleadings, which the trial court overruled.   Todd filed a notice of appeal, but we dismissed the appeal for lack of a final, appealable order.

{¶ 4} On November 5, 2021, Sowry moved for summary judgment on the complaint.   According to the motion, Todd had admitted to transferring certain funds, which had been contributed solely by Boggs, from joint bank accounts in the names of Boggs and Todd to bank accounts solely in Todd's name.   These transfers occurred before Boggs's death.   Therefore, Sowry argued Todd had forfeited her survivorship rights to the funds, which converted the funds to an asset of Boggs's estate.   The motion requested that the trial court impose a constructive trust over the funds Todd had transferred from the joint bank accounts to her own individual bank accounts.

{¶ 5} After communicating several times by text message, Todd and Sowry had a 90-minute telephone conversation on November 13, 2021, to discuss the litigation. During their discussion, the sisters orally agreed to settle the matter, and Todd's husband

prepared a written document to memorialize what he understood to be their wishes. As a result, on November 19, 2021, Todd filed a motion to enforce a settlement agreement. The magistrate sustained the motion. Sowry filed objections to the magistrate's decision. The trial court overruled the objections and granted Todd's motion to enforce the settlement agreement. Sowry filed a notice of appeal.

{¶ 6} On April 18, 2023, we reversed the trial court's judgment. We concluded that "Todd did not provide any benefit to Sowry, nor did she incur a detriment in exchange for Sowry's promises." *Sowry v. Todd*, 2023-Ohio-1162, ¶ 47 (2d Dist.). Therefore, the purported settlement agreement lacked consideration, which precluded the enforcement of the agreement. We reversed the judgment and remanded the matter for further proceedings. Todd filed a notice of appeal to the Ohio Supreme Court, which declined to accept jurisdiction. *Sowry v. Todd*, 2023-Ohio-2972.

{¶ 7} After our remand, Todd filed a memorandum in opposition to Sowry's motion for summary judgment and a cross-motion for summary judgment. According to Todd, all of the transfers from the joint bank accounts had been made at the express direction of Boggs. Sowry opposed Todd's cross-motion, arguing that Todd's affidavit and deposition testimony were self-serving and could not be used on summary judgment without corroborating evidence.

{¶ 8} The magistrate denied both of the summary judgment motions. Sowry filed objections to the magistrate's decision, and Todd filed a memorandum opposing the objections and asking the trial court to grant judgment in Todd's favor. Due to irregularities in how the magistrate's order was issued, the trial court remanded the matter

to the magistrate to issue a proper magistrate's decision. Around that same time, Sowry filed a motion seeking additional discovery pursuant to Civ.R. 56(F). The trial court granted the motion, and the parties conducted additional discovery, including taking the deposition of Shirley Hughes, a friend of Boggs's who eventually became Boggs's caretaker.

{¶ 9} After completing additional discovery, the parties supplemented their summary judgment briefing. The magistrate denied Sowry's motion for summary judgment and granted Todd's motion for summary judgment. Sowry filed objections to the magistrate's decision. On September 3, 2024, the trial court overruled Sowry's objections, denied Sowry's motion for summary judgment, and granted Todd's motion for summary judgment. Sowry filed a timely notice of appeal.

II. The Trial Court Did Not Err in Granting Summary Judgment to Todd

{¶ 10} Sowry's first and fourth assignments of error are interrelated, and we will address them together. These two assignments of error state:

> The Trial Court committed reversible error in determining that the imposition of a constructive trust under *Cowling* requires proof of an "inequitable result" from the transaction beyond Appellee's mere act of withdrawing funds in excess of those she contributed.

> The Trial Court committed reversible error in determining that there existed no genuine issue of material fact and that Appellee was entitled to summary judgment; instead, summary judgment should have been granted

to Appellant.

{¶ 11} "When reviewing a decision granting summary judgment, we apply a de novo standard of review." *State ex rel. Armatas v. Plain Twp. Bd. of Zoning Appeals*, 2020-Ohio-2973, ¶ 8, citing *Esber Beverage Co. v. Labatt USA Operating Co., L.L.C.*, 2013-Ohio-4544, ¶ 9. Summary judgment is appropriate when " '(1) [n]o genuine issue as to any material fact remains to be litigated; (2) the moving party is entitled to judgment as a matter of law; and (3) it appears from the evidence that reasonable minds can come to but one conclusion, and viewing such evidence most strongly in favor of the party against whom the motion for summary judgment is made, that conclusion is adverse to that party.' " *Id.*, quoting *Temple v. Wean United, Inc.*, 50 Ohio St.2d 317, 327 (1977).

{¶ 12} The moving party carries the initial burden of affirmatively demonstrating that no genuine issue of material fact remains to be litigated. *Mitseff v. Wheeler*, 38 Ohio St.3d 112, 115 (1988). To this end, the movant must be able to point to evidentiary materials of the type listed in Civ.R. 56(C) that a court is to consider in rendering summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293 (1996). "The substantive law of the claim or claims being litigated determines whether a fact is 'material.' " *Perrin v. Cincinnati Ins. Co.*, 2020-Ohio-1405, ¶ 29 (2d Dist.), citing *Herres v. Millwood Homeowners Assn., Inc.*, 2010-Ohio-3533, ¶ 21 (2d Dist.).

{¶ 13} Once the moving party satisfies its burden, the nonmoving party may not rest upon the mere allegations or denials of the party's pleadings. *Dresher* at 293; Civ.R. 56(E). Rather, the burden then shifts to the nonmoving party to respond, with affidavits or as otherwise permitted by Civ.R. 56, setting forth specific facts that show that there is

a genuine issue of material fact for trial. *Dresher* at 293, citing Civ.R. 56(E). "[I]f the nonmovant does not so respond, summary judgment, if appropriate, shall be entered against the nonmoving party." *Id.* " 'When reviewing a motion for summary judgment, a court must be careful not to weigh the evidence or judge the credibility of witnesses. . . . Instead, it must consider all of the evidence and reasonable inferences that can be drawn from the evidentiary materials in favor of the nonmoving party.' " *McDaniel v. Daly*, 2008-Ohio-2080, ¶ 74 (2d Dist.), quoting *Cox v. Barsplice Products, Inc.*, 2001 WL 669336, *1 (2d Dist. June 15, 2001).

{¶ 14} In its judgment overruling the objections and granting summary judgment to Todd, the trial court explained that Sowry, as the party seeking to have a constructive trust imposed, bore the burden of producing clear and convincing evidence justifying it. According to the trial court, "[i]n this case, when looking at equity considerations, there is not even a hint or suggestion of any concealment, conversion, embezzlement, improper taking nor fraud. In fact, it is undisputed that had [Todd] not removed the money from the joint accounts she held with [Boggs], it would have passed to her as a joint account owner immediately upon [Boggs's] death." Judgment (Sept. 3, 2024), p. 5. Based on its review of the deposition testimony and affidavits, the trial court stated that "[n]othing [Todd] did removing money from the joint accounts with her mother impacted whatsoever what [Sowry] received after her mother's death. [Sowry] got one-half and her sister got one-half of [Boggs's] money." *Id.* Therefore, "[r]easonable minds could only conclude that [Boggs] intended both daughters to have half of the cash accounts each. There is no evidence that the decedent ever intended that these funds should be part of her

estate." *Id.* The trial court concluded that Todd "presented Civ.R. 56(C) evidence that she was co-owner of the funds in the joint accounts with [Boggs] and was authorized by [Boggs] to withdraw the funds from the joint accounts when she made the withdrawals in question. [Boggs] never objected to the removal of the money from her joint account with [Todd] to [Todd's] sole account." *Id.* at 6. As a result, the trial court granted summary judgment to Todd on Sowry's complaint and denied Sowry's motion for summary judgment.

{¶ 15} Before determining whether the trial court erred in granting Todd's motion for summary judgment and overruling Sowry's motion for summary judgment, we will summarize the testimony of Hughes and Todd.

### a. Deposition Testimony

{¶ 16} Shirley Hughes was deposed on April 24, 2024. She had been Boggs's neighbor for several years before Boggs died. A couple of years before Boggs died and after Boggs's husband had passed away, Hughes began mowing Boggs's yard for her and occasionally took food to her. Approximately 18 months before Boggs died, Hughes began doing additional tasks for Boggs and spending more time with her. She eventually became Boggs's caretaker. While she was in the caretaker role, Boggs wrote her checks at the rate of $15 per hour for her assistance. Hughes considered Boggs a friend.

{¶ 17} Hughes was aware that Sowry shared joint bank accounts with Boggs because Sowry's name was on the checks that Boggs wrote Hughes to pay her for mowing the lawn. Hughes observed Boggs reviewing her bank statements, but Boggs

never discussed anything with Hughes regarding the bank statements.

{¶ 18} Boggs asked Hughes to accompany her to a couple of banks one day so that Boggs could "make things right with [Todd]." Todd and her husband also accompanied Boggs and Hughes to the banks. The first bank they went to was Fifth Third Bank. There, Hughes heard Boggs tell the bank employee to put all of the money in Todd's name. According to Hughes, Todd said, "no, Mom, make it fair if you're going to do it." The bank representative then asked Boggs how much to put in Todd's name, and Boggs responded "half." Hughes also accompanied Boggs into the Wright-Patt Credit Union later that day but did not pay much attention to what was said at that bank. At the time Boggs and Hughes went to the banks, Boggs had a difficult time walking but was fully coherent from a mental standpoint.

{¶ 19} Hughes stated that she had had many conversations with Boggs about life and that Boggs had said on multiple occasions that she wanted to make things right with Todd. However, Hughes conceded that she could only remember one specific conversation at the time of her deposition. Hughes also acknowledged that she assumed Boggs's statements about "making things right" meant she wanted to make things right regarding finances, but she never asked Boggs any follow-up questions to confirm that her assumption was correct. During her deposition, Hughes agreed that some of the statements in her affidavit were inaccurate or based on assumptions she had made. However, Hughes reiterated that "[i]t was clear to me that [Boggs] wanted to provide money to [Todd] and that she wanted to do so during life and upon her passing."

{¶ 20} Todd was deposed on September 15, 2021. She had been married to her

husband Ryan since 2010. When Boggs passed away in October 2019, she was 92 years old. Although Boggs had some health issues before she passed away, Todd testified that Boggs's mind was still sharp at the time of her death. Sowry had been involved in making all the medical decisions for Boggs.

{¶ 21} On September 4, 2019, Todd accompanied her husband, Boggs, and Hughes to Fifth Third Bank and Wright-Patt Credit Union. At Fifth Third Bank, Boggs transferred $49,509.65 out of a joint bank account that was in Boggs and Sowry's names into a new joint bank account that was in Boggs and Todd's names. The $49,509.65 withdrawn by Boggs from the joint bank account with Sowry constituted half of the amount that was in Boggs and Sowry's account. Todd believed all the money that was in Sowry and Boggs's joint bank accounts had been contributed solely by Boggs. Todd subsequently transferred all but $100 out of the new joint account and put it into her own personal account. As of the date of her deposition, that money was still in Todd's personal bank account. Todd testified that she made that transfer at Boggs's instruction and that she discussed this transfer with her husband before she made it. Boggs also withdrew money from her Wright-Patt Credit Union joint bank account with Sowry and transferred it to a new joint account with Boggs and Todd's names on the account. Todd subsequently transferred all but $100 from that new joint bank account into her own personal bank account pursuant to Boggs's instructions. As of the date of Todd's deposition, all of that money was still in her personal account. All of the money that was in Boggs and Todd's joint bank accounts was contributed by Boggs.

{¶ 22} Todd conceded that there was nothing in writing from her mother instructing

her to make the transfers into Todd's personal accounts. Rather, Boggs orally instructed her to do it. No other individuals were present when Boggs gave this instruction. Todd conceded that there had not been a consistent pattern of gift giving by Boggs to her.

### b. Analysis

{¶ 23} Sowry argues that the trial court erred when it assumed that she must prove an inequitable result based upon some evidence of concealment, conversion, embezzlement, improper taking, or fraud in order to succeed on the claims against Todd. According to Sowry, the trial court misread the Ohio Supreme Court's decision in *Estate of Cowling v. Estate of Cowling*, 2006-Ohio-2418. Sowry contends that all she needed to show was that Todd withdrew money from the joint bank accounts Todd shared with Boggs in excess of Todd's contributions to those accounts. Once Sowry submitted evidence establishing this fact, she believes she was entitled to summary judgment and Todd's motion for summary judgment should have been denied.

{¶ 24} Todd responds that the trial court properly granted her summary judgment because the undisputed evidence showed that Boggs had directed the transfers that Todd made into her own account. Appellee's Brief, p. 7. Further, Todd contends that "there simply is no evidence of a bad act, fraud, or principle of equity that would justify the imposition of a constructive trust and forfeiture of the survivorship right [Todd] had in the accounts created with her mother." *Id.* at 9. According to Todd, this case is most like the facts of *DiPalma v. DiPalma*, 2023-Ohio-4053 (9th Dist.), and therefore she was entitled to summary judgment for the reasons expressed in that decision.

{¶ 25} A review of the *Estate of Cowling* and *DiPalma* decisions is helpful in resolving Sowry's first and fourth assignments of error. Grace and Garnard Cowling were married in 1967. It was a second marriage for both, and each had children from a previous marriage; they had no children together. *Estate of Cowling* at ¶ 2. Grace and Garnard owned various brokerage accounts and stock investments jointly with rights of survivorship. Garnard transferred assets from their joint brokerage accounts into his own name sometime in 1996 or 1997 and then placed those assets into transfer on death accounts with his children named as the only beneficiaries. *Id.* at ¶ 3. Garnard died in February 1998, and the $325,358.69 he had transferred passed to his children.

{¶ 26} Grace discovered these transfers and filed an equitable claim against Garnard's children for a declaratory judgment to establish a constructive trust over the assets transferred by Garnard to his children. She also made claims against Garnard's estate for breach of contract, conversion, breach of fiduciary duty, negligent misrepresentation, and fraud. *Id.* at ¶ 4. Grace's expert estimated that 74 percent of the assets in the joint accounts had been attributable to contributions made by Grace.

{¶ 27} The jury found that Garnard had withdrawn funds from the accounts in excess of the contributions attributable to him and that the amount of damages suffered by Grace was $255,354. Therefore, the trial court declared a constructive trust in the total amount of $255,354 in proportion to the amount that each child had individually received from Garnard. *Id.* at ¶ 6-7. However, the court of appeals reversed the trial court's denial of the children's motions for directed verdict and judgment notwithstanding the verdict regarding the claim for the establishment of a constructive trust. *Id.* at ¶ 10.

The Ohio Supreme Court then accepted a discretionary appeal.

{¶ 28} The Ohio Supreme Court began its decision by noting that " '[t]he existence of a joint and survivorship bank account raises a rebuttable presumption that co-owners of the account share equally in the ownership of the funds on deposit.' " *Id.* at ¶ 12, quoting *Vetter v. Hampton*, 54 Ohio St.2d 227 (1978), paragraph three of the syllabus. "This presumption applies in the absence of evidence to the contrary." *Id.*, citing *Vetter* at paragraph four of the syllabus. Further, the Court noted that " '[a] joint and survivorship account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent.' " *Id.*, quoting *In re Estate of Thompson*, 66 Ohio St.2d 433 (1981), paragraph one of the syllabus. Because the jury's damages award was not challenged on appeal, the Ohio Supreme Court assumed that the $255,354 number was the equivalent of a determination of Grace's net contributions. The Court then had to determine whether the assets inherited by Garnard's children should be held in trust for Grace. *Id.* at ¶ 17.

{¶ 29} The supreme court summarized the relevant law on constructive trusts as follows:

A constructive trust is a " 'trust by operation of law which arises contrary to intention and in invitum, against one who, by fraud, actual or constructive, by duress or abuse of confidence, by commission of wrong, or by any form of unconscionable conduct, artifice, concealment, or questionable means, or who in any way against equity and good

conscience, either has obtained or holds the legal right to property which he ought not, in equity and good conscience, hold and enjoy. It is raised by equity to satisfy the demands of justice.' " . . . A constructive trust is considered a trust because " '[w]hen property has been acquired in such circumstances that the holder of the legal title may not in good conscience retain the beneficial interest, equity converts him into a trustee.' " . . .

A constructive trust is an equitable remedy that protects against unjust enrichment and is usually invoked when property has been obtained by fraud. . . . "[A] constructive trust may also be imposed where it is against the principles of equity that the property be retained by a certain person even though the property was acquired without fraud." . . . "In applying the theories of constructive trusts, courts also apply the well known equitable maxim, 'equity regards [as] done that which ought to be done.' " . . .

The party seeking to have a constructive trust imposed bears the burden of proof by clear and convincing evidence. . . .

(Citations omitted.) *Id.* at ¶ 18-20.

**{¶ 30}** The court held that Grace's estate had presented clear and convincing evidence of the inequitable situation or unjust enrichment that would result if Garnard's children were permitted to retain the assets that Garnard had transferred. *Id.* at ¶ 32-33. Therefore, Grace's estate was entitled to a constructive trust over the funds that had been transferred to the Cowling children to which Grace had objected during her life.

{¶ 31} In *DiPalma*, 2023-Ohio-4053 (9th Dist.), Catherine DiPalma withdrew approximately $85,000 from two joint accounts that she shared with her father, John DiPalma. She made these withdrawals two days prior to John's death. John did not object to the withdrawals before he died and neither did the bank. *Id.* at ¶ 2. Michael DiPalma, Catherine's brother, subsequently filed a complaint against Catherine relating to the withdrawals. Michael alleged, among other things, that Catherine had concealed, embezzled, and was in wrongful possession of the funds she had withdrawn from the joint bank accounts. *Id.* at ¶ 3. The trial court ultimately granted summary judgment to Catherine. Michael filed a timely notice of appeal.

{¶ 32} The Ninth District affirmed the judgment of the trial court. The court explained that the existence of a joint and survivorship bank account raised a rebuttable presumption that co-owners of the account shared equally in the ownership of the funds on deposit. *Id.* at ¶ 14, citing *Estate of Cowling*, 2006-Ohio-2418, at ¶ 12, citing *Vetter*, 54 Ohio St.2d 227, at paragraph three of the syllabus. The Ninth District then noted that " '[a] joint and survivorship account belongs, during the lifetime of all parties, to the parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent.' " *Id.*, quoting *Estate of Cowling* at ¶ 12, citing *In re Estate of Thompson*, 66 Ohio St.2d 433, at paragraph one of the syllabus.

{¶ 33} The Ninth District found that there was clear and convincing evidence in the record that John had intended for the money in the joint account to belong to both John and Catherine. The court pointed to the terms of the joint bank account agreement, which provided that any use of the account by either of the joint account holders shall be

deemed ratified by the other joint account holder as if the transaction had been made and authorized by all of the joint account holders. Further, the court noted that Catherine testified that (1) her father added her to the accounts because he wanted her to share in the money in the accounts with him, and (2) shortly before he died, her father had instructed her to transfer the money from the joint accounts into her own account.

{¶ 34} The *DiPalma* court rejected Michael's reliance on the ownership-during-lifetime presumption set forth in *In re Estate of Thompson*. According to the Ninth District:

> Here, there is no controversy that arose during the parties' lifetime. It is undisputed, and in fact stipulated by the parties, that John never disputed Catherine's withdrawal of the funds during his lifetime. Additionally, Catherine testified that she, as a joint account holder, completed the withdrawal at her father's request. Therefore, the ownership-during-lifetime presumption that Michael asks this Court to apply is not applicable.

*DiPalma* at ¶ 21.

{¶ 35} *DiPalma* also held that Catherine had presented sufficient evidence to meet her summary judgment burden by showing she was a co-owner of the funds in the joint accounts and was authorized to withdraw the funds from the joint accounts when she made the withdrawals in question. However, it concluded that Michael had not met his reciprocal summary judgment burden. Therefore, the *DiPalma* court affirmed the trial court's grant of summary judgment to Catherine. *Id.* at ¶ 23.

{¶ 36} Based on our review of the record and the applicable legal authority, we conclude that the trial court did not err in granting summary judgment to Todd on Sowry's complaint. Todd met her summary judgment burden by putting forth evidence that Boggs had transferred money from her and Sowry's joint accounts to new joint accounts that belonged to Boggs and Todd. Sowry did not allege any wrongdoing, fraud, undue influence, or lack of mental capacity that led Boggs to make these voluntary transfers. "The opening of a joint and survivorship account in the absence of fraud, duress, undue influence or lack of capacity on the part of the decedent is conclusive evidence of his or her intention to transfer to the surviving party or parties a survivorship interest in the balance remaining in the account at his or her death." *Wright v. Bloom*, 69 Ohio St.3d 596 (1994), paragraph two of the syllabus, *overruling In re Estate of Thompson*, 66 Ohio St.2d 433, paragraph two of the syllabus. Further, Todd presented evidence through both her deposition testimony and Hughes's deposition testimony that Boggs made these transfers to ensure that Todd received half of the money in Boggs's original bank accounts while Sowry received the other half. This is consistent with using a joint bank account as an estate planning tool. The nature of joint bank accounts allows either party to access the funds in that account without the other party having to contact the bank to give permission for the withdrawal of funds. The evidence presented by Todd carried her initial summary judgment burden.

{¶ 37} Sowry did not meet her reciprocal burden to submit sufficient evidence to create a genuine issue of material fact. Rather, Sowry relied solely on the legal principle that " '[a] joint and survivorship account belongs, during the lifetime of all parties, to the

parties in proportion to the net contributions by each to the sums on deposit, unless there is clear and convincing evidence of a different intent.' " *Estate of Cowling* at ¶ 12, quoting *Estate of Thompson* at paragraph one of the syllabus. But we agree with the Ninth District that this legal principle applies to disputes that are raised by an aggrieved party during their lifetime. If Boggs had any objections to Todd's withdrawals of money from their joint accounts, she could have raised them during her lifetime. But Sowry presented no evidence that Boggs raised any concerns about the withdrawals. On the other hand, Todd presented evidence that Hughes had observed Boggs reviewing or "studying" her bank account statements, and that Boggs never mentioned that anything was inappropriate on the statements. The lack of concern expressed by Boggs during her lifetime is not surprising given that joint bank accounts are often used as an estate planning tool to ensure that beneficiaries obtain a decedent's bank assets without having to go through the delay or cost of probate.

{¶ 38} Sowry asked the trial court to impose a constructive trust on the amount of money that Todd withdrew from the joint bank accounts while Boggs was alive. We agree with the trial court that a constructive trust is a tool for addressing situations where it is clear a party has been unjustly enriched, or an inequitable situation resulted from a party's improper action. *See Estate of Cowling*, 2006-Ohio-2418, at ¶ 32. As the trial court correctly pointed out, Todd was due to receive at the time of Boggs's death all of the money from the joint bank accounts held by her and Boggs. This is unlike the facts in the *Estate of Cowling,* where Grace Cowling was due to receive the money from the joint brokerage accounts at the time of her husband's death until her husband effectively

denied her this money by transferring the money out of the accounts to ensure that his children received the money at the time of his death, not Grace. There, Grace objected to the transfers during her lifetime, and a constructive trust was necessary to prevent an inequitable result. Here, there was no evidence, let alone clear and convincing evidence, that it was inequitable for Todd to keep the money she withdrew from the joint bank accounts with her mother. Todd, not Sowry, was due to receive the money in the joint bank accounts at the time of Boggs's death. Therefore, Todd's transfer of money from those accounts to her own personal bank accounts did not create an unjust or inequitable result for Sowry. Indeed, Sowry had no legal entitlement to any of the funds that were in the joint bank accounts of Boggs and Todd during Boggs's lifetime or after Boggs died.

{¶ 39} If Sowry had presented evidence that Boggs did not intend for Todd to have access to the money during Boggs's life, that Boggs had been deceived into depositing money into the joint bank accounts, that Boggs lacked the capacity to make the deposits into the joint bank accounts, or that Boggs did not intend for the money to go to Todd at the time of Boggs's death, then summary judgment likely would not have been appropriate. But such evidence is not in the record before us. Rather, the undisputed facts before us show that Boggs, while she was of sound mind, voluntarily deposited money into joint bank accounts that she shared with her daughter, Todd. Relatively shortly before making that deposit, Boggs told her friend, Hughes, that she wanted to make things right with Todd. Boggs asked Hughes to accompany her and Todd to the banks to make the necessary withdrawals and deposits. Hughes interpreted Boggs's words and actions as meaning she wanted the money to go to Todd. This is

corroborated by the nature of joint bank accounts.   And Hughes's testimony corroborated Todd's testimony.   Therefore, the trial court correctly found that Todd was entitled to summary judgment.

{¶ 40} The first and fourth assignments of error are overruled.

III.     The Trial Court Did Not Err By Considering the Testimony of Todd and Hughes

{¶ 41} We will address Sowry's second and third assignments of error together because they both concern the trial court's reliance on alleged hearsay evidence. Sowry's second assignment of error states:

> The Trial Court committed reversible error in determining that Appellee's
> self-serving statements, without any supporting evidence, were admissible
> for purposes of summary judgment as the material statements were
> inadmissible because they were not based on Appellee's personal
> knowledge or they were inadmissible hearsay.

{¶ 42} Sowry's third assignment of error states:

> The Trial Court committed reversible error in determining that Shirley
> Hughes' testimony, by deposition and affidavit, was admissible for purposes
> of summary judgment as the material statements were inadmissible
> hearsay; similarly, the material statements were irrelevant to the subject
> transactions and did not support summary judgment for Appellee.

{¶ 43} "When ruling on a summary-judgment motion, a trial court may consider only evidence that would be admissible at trial."   *Thomas v. Servicemaster Absolute*

*Cleaning Restoration Inc.*, 2023-Ohio-1837, ¶ 26 (2d Dist.), citing *Turnmire v. Turnmire*, 2022-Ohio-3968, ¶ 24 (12th Dist.). "This includes hearsay included in deposition testimony, which is inadmissible in the summary-judgment context unless a hearsay exception applies." *Id.*, citing *Turnmire* at ¶ 24-25. Under Civ.R. 32(A), a deposition may be used to support a motion only "so far as admissible under the rules of evidence applied as though the witness were then present and testifying[.]"

**{¶ 44}** Sowry argues that the only evidence that Boggs requested Todd to transfer the money from their joint bank accounts to Todd's separate accounts "came from [Todd's] own affidavit and deposition testimony, which could only be the recitation of inadmissible hearsay, not facts based on her own personal knowledge." Appellant's Brief, p. 21. Sowry contends that Todd offered no statement purportedly made by Boggs that could be potentially admissible under Evid.R. 803(3). Further, according to Sowry, a party's own self-serving assertions cannot defeat a well-supported motion for summary judgment unless the assertions are corroborated by outside evidence.

**{¶ 45}** Todd responds that Boggs's instructions to her as embodied in Todd's affidavit and deposition testimony were statements of donative intent, indicative of a then existing state of mind or intent, and admissible pursuant to Evid.R. 803(3). Todd also contends that her statements in her affidavit and deposition were based on her personal experience and Sowry had no factual evidence to dispute them.

**{¶ 46}** "Although we conduct a de novo review of the trial court's decision to grant summary judgment, we review the court's rulings on the admissibility of evidence for an abuse of discretion." *People's Bank, Natl. Assn. v. Tome*, 2011-Ohio-5412, ¶ 13 (4th

Dist.), citing *Lawson v. Y.D. Song, M.D., Inc.*, 1997 WL 596293, *3 (4th Dist. Sept. 23, 1997), and *State v. Sage*, 31 Ohio St.3d 173 (1987), paragraph two of the syllabus. The term "abuse of discretion" implies that the court's attitude is unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶ 47} We conclude that the trial court did not abuse its discretion by considering Todd's testimony. Sowry relies primarily on the general proposition that a party's affidavit and testimony is by its nature self-serving and therefore not an adequate basis on which to grant summary judgment. That proposition is not entirely accurate.

{¶ 48} "An otherwise-competent affidavit is not invalid for the sole reason that it is executed by a party and submitted to aver facts" relating to a summary judgment motion. *Patel v. Krisjal, L.L.C.*, 2013-Ohio-1202, ¶ 35 (10th Dist.). *Accord Smith v. CBert Properties, LLC*, 2019-Ohio-12, ¶ 11 (2d Dist.). Rather, an affidavit may be used in support of or in opposition to a motion for summary judgment if it is made on personal knowledge. While Civ.R. 56 imposes no absolute corroboration requirement, *Smith* at ¶ 11, a party has a much better likelihood of success at the summary judgment stage when his or her testimony is supported by corroborating evidence.

{¶ 49} Sowry did not present any evidence disputing that Boggs voluntarily contributed all of the money to her joint bank accounts with Sowry or that Boggs voluntarily withdrew half of that money to fund her new joint bank accounts with Todd. Further, Sowry did not point to any evidence that Todd lied about Boggs instructing her to transfer the money from their joint bank accounts to Todd's personal account. Sowry also failed to present any evidence that Boggs objected to those transfers. Todd's

testimony, on the other hand, was corroborated by Hughes's testimony and the legal nature of joint bank accounts, which are a well-recognized tool used in estate planning. Therefore, we cannot conclude that the trial court abused its discretion by considering Todd's testimony.

{¶ 50} Finally, Sowry argues that the trial court should not have considered Hughes's testimony because it was based on inadmissible hearsay. Sowry contends that Hughes's testimony that Boggs wanted to make things right occurred at least three weeks before they went to the bank to make the transfer, which made the statement irrelevant as to Boggs's alleged donative intent. Sowry believes this lack of temporal connection also made Hughes's testimony inadmissible hearsay. Further, Sowry argues that the testimony was based on speculation that Boggs's statement about wanting to make things right related to financial or estate planning. Finally, Sowry argues that Hughes's testimony lacked credibility due to her admission that some of the statements in her affidavit were incorrect. Sowry believes the trial court should have granted her motion to strike Hughes's affidavit. Todd responds that any potential hearsay evidence relied upon by the trial court fit within an exception to the hearsay rule.

{¶ 51} Evid.R. 803(3) provides that the following is not excluded by the hearsay rule:

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact remembered or believed unless it relates to the

execution, revocation, identification, or terms of declarant's will.

"A declarant's statement of donative intent, at the time of delivery of the property to the donee, is a statement indicative of a then existing state of mind or intent and is admissible pursuant to Evid. R. 803(3)." *Vogel v. Campanaro*, 2021-Ohio-4245, ¶ 35 (12th Dist.), citing *Richards v. Wasylyshyn*, 2012-Ohio-3733, ¶ 22 (6th Dist.), and *McGrew v. Popham*, 2007-Ohio-428, ¶ 30 (5th Dist.).

**{¶ 52}** Hughes testified that Boggs wanted to make things right financially with Todd. Hughes understood the trip to Boggs's banks to transfer funds into new joint bank accounts with Todd to be Boggs's way of making things right financially. Further, the establishment of the joint bank accounts with Todd was evidence of Boggs's donative intent, especially in the absence of other reasons why Boggs would set up a joint account with Todd. As the Eleventh District has noted, " 'Ohio courts no longer consider evidence concerning the present donative intent of the decedent because the opening of the joint and survivorship account is conclusive evidence of the decedent's intent to transfer a survivorship interest in the balance of the account's assets at his . . . death.' " (Emphasis omitted.) *Dorsey v. Dorsey*, 2011-Ohio-6336, ¶ 61 (11th Dist.), quoting *In re Estate of Anderson*, 2000 Ohio App. LEXIS 5928, *14, fn. 1 (11th Dist. Dec. 15, 2000).

**{¶ 53}** On the record before us, the undisputed facts show that Boggs voluntarily took exactly one-half of the money out of her joint bank accounts with Sowry to set up new joint bank accounts with Todd. This is consistent both with the donative intent about which Hughes and Todd testified and the idea of using joint bank accounts as an estate planning tool. The timing of the transfers, shortly before Boggs's death, also directly

supported the inference that Boggs set up the joint bank accounts with Todd to ensure that she received one-half of the money while Sowry received the other half. Moreover, Hughes and Todd testified that although Boggs's physical health was failing at the time of the transfers at issue, her mental state was fully intact. Sowry submitted no evidence showing Boggs may have had a different intent or state of mind when she set up the joint bank accounts with Todd. Therefore, the trial court did not abuse its discretion in considering Hughes's testimony regarding Boggs's donative intent.

**{¶ 54}** The second and third assignments of error are overruled.

IV.    Conclusion

**{¶ 55}** Having overruled all of the assignments of error, we affirm the judgment of the trial court.

. . . . . . . . . . . . .

TUCKER, J. and HUFFMAN, J., concur.